RITE AID CORPORATION, a corporation of the State of Delaware, et al., Plaintiffs,

v.

The BOARD OF PHARMACY OF the STATE OF NEW JERSEY et al., Defendants.

Civ. A. No. 74–1628.

United States District Court, D. New Jersey.

Sept. 14, 1976.

Robinson, Wayne & Greenberg by Donald A. Robinson, Ronald J. Riccio, Newark, N. J., for plaintiffs.

William F. Hyland, Atty. Gen. of New Jersey by Bertram P. Goltz, Jr., J. Paul Dizzia, Deputy Attys. Gen., Trenton, N. J., for defendants.

Before GARTH, Circuit Judge, and LACEY and STERN, District Judges.

## OPINION

GARTH, Circuit Judge.

Plaintiffs, Rite Aid Corporation, Rite Aid Pharmacy of Bergenfield, Inc., and Milton H. Silver seek to declare unconstitutional and to enjoin the enforcement of certain New Jersey statutes which regulate the practice of pharmacy. The statutes challenged are N.J.S.A. 45:14–1, 3, 12, and 35 of the New Jersey Pharmacy Act and N.J.S.A. 52:14B–10(c) of the New Jersey Administrative Procedure Act. After a plenary trial on the merits before a three-judge district court convened pursuant to 28 U.S.C. § 2281 et seq., we have concluded that it would be inappropriate to abstain from exercising federal jurisdiction and that the plaintiffs have failed to carry their burden of establishing the unconstitutionality of the challenged statutes.

## I.

The retail pharmacy industry in New Jersey distributes pharmaceuticals through both independently owned pharmacies and corporations owning several pharmacies (chain stores).[1] Of the approximate 1,560 retail pharmacies in New Jersey, 168 or 10.8% are owned and operated as chain stores. Rite Aid[2] is the largest pharmacy chain store system in New Jersey. Since 1966, when Rite Aid opened its first store in New Jersey, it has grown in number to 51 stores located throughout the state. In addition to prescription items, Rite Aid sells health and beauty aids at discounts of 15 to 35%. Rite Aid's prescription prices are 15 to 20% lower than the average price charged by an independently owned pharmacy.

The practice of pharmacy in New Jersey is regulated by the Board of Pharmacy of the State of New Jersey (Board) which is composed of five registered pharmacists "actively engaged in conducting a pharmacy" (N.J.S.A. 45:14–1), one lay "public member" representing the interests of the public (N.J.S.A. 45:1–2.2(b)) and one lay state executive official (N.J.S.A. 45:1–2.2(c)). In appointing the five pharmacist board members, the Governor gives consideration to the recommendations submitted by the New Jersey Pharmaceutical Association. See N.J.S.A. 45:1–2.2(a); Campbell dep. at 96–98. At the time this action was brought, all the pharmacist Board members owned independent retail pharmacies.[3]

On April 6, 1973 Paul Pumpian, the Secretary to the Board, received two letters complaining that Rite Aid's store in Bergenfield, New Jersey (Rite Aid of Bergenfield, Inc.) was improperly filling prescriptions. Pumpian, at the request of the Board, referred the letters to the Enforcement Bureau of the Division of Consumer Affairs. The Enforcement Bureau is that organization of New Jersey state government charged with conducting investigations and inspections for the nineteen professional or occupational licensing boards within the Division of Consumer Affairs. From April to July, 1973, the Enforcement Bureau conducted an investigation of the Bergenfield pharmacy.[4]

On August 27, 1973 the Enforcement Bureau forwarded the written report of its investigation to the Board. On the basis of that report the Board members concluded that there was sufficient cause to believe that Rite Aid of Bergenfield had filled and refilled prescriptions without authorization, and that it had sold and distributed an adulterated pharmaceutical. The Board forwarded the report to the Attorney General's office for the institution of disciplinary proceedings. Thereafter, a complaint was served charging Rite Aid of Bergenfield and Milton Silver and David Carter, pharmacists at Bergenfield, with unlawfully dispensing and selling prescription drugs in violation of N.J.S.A. 45:14–26.1 (filling or refilling prescriptions without authorization); N.J.S.A. 45:14–15 (recording of prescriptions); and N.J.S.A. 45:14–16 (failure to strictly follow prescription).

The Board determined that a hearing officer should be appointed under a procedure

---

**1.** The definition of chain store pharmacy is far from clear. The National Association of Chain Drug Stores defines a chain store system for membership purposes as common ownership of four or more pharmacies. See Tr. at 168. The parties have described chain stores as "pharmacies owned by corporations possessing 10 or more individual pharmacy permits." Consented Stipulation of Facts § D.1. For the purpose of this litigation we accept the definition of the parties.

**2.** Rite Aid Corporation is a publicly held corporation of the State of Delaware. Rite Aid stock is traded on the New York Stock Exchange.

Rite Aid of Bergenfield, Inc. is a subsidiary of Rite Aid Corporation.

**3.** At the present time, four of the five pharmacists on the Board own independent retail pharmacies.

**4.** After the Bureau started its investigation, it received an additional complaint about the Bergenfield pharmacy from the New Jersey Department of Health, Division of Narcotic and Drug Abuse Control. The Enforcement Bureau also investigated that complaint and thereafter concluded that it was without any basis in fact.

whereby his findings would be reviewed and the scope of disciplinary action, if any, would be established by the Board. The Attorney General of New Jersey provided the Board at its request, with a list of . available hearing officers. The list was composed of retired judges of the New Jersey Superior Court. From this list the Board chose Judge Nelson K. Mintz.

On July 29 and 30, 1974, Judge Mintz as hearing officer held hearings regarding the alleged Rite Aid violations. Thereafter, on September 24, 1974, his report issued, finding that Rite Aid of Bergenfield had filled and refilled prescriptions without authorization, dispensed a prescription in adulterated form, failed to affix a proper label on a prescription, and failed to properly record the name of the dispensing pharmacist. As to Milton Silver, Judge Mintz concluded that he dispensed a prescription drug without authorization and without affixing a label to the container. Carter was not found to have violated any provision of the pharmacy laws. Judge Mintz recommended that Rite Aid of Bergenfield's pharmacy permit be suspended for thirty days and that Silver's license be suspended for seven days. No monetary fine was recommended.

Rite Aid[5] filed exceptions with the Board. However, on December 6, 1974 the Board issued its Decision and Order which adopted the entire report of its hearing officers, but increased the suspension of Rite Aid of Bergenfield's pharmacy permit to ninety days.[6] The Board also modified the hearing officer's recommendation as to Silver. Silver's license was not suspended, but in lieu thereof, the Board assessed a civil penalty of $325.00 which was suspended.

Thereafter, Rite Aid applied to a single judge of the district court for a preliminary injunction staying the operation of the Board's order pending a decision on these proceedings. The Board consented to a stay of its order pending the outcome of this litigation.

On January 17, 1975 Rite Aid filed its Second Amended Complaint and Request for Convocation of Three Judge Court.[7] The Complaint named the Board, its secretary, the five pharmacist Board members and the Governor and Attorney General of New Jersey as defendants.

The First and Second Counts of the Complaint allege that N.J.S.A. 45:14–1[8] re-

5. Rite Aid Corporation, Rite Aid Pharmacy of Bergenfield, Inc. and Milton Silver are hereinafter jointly referred to as "Rite Aid."

6. Rite Aid's suspension was followed by a probationary period of two years.
 It was testified to at trial that the reason for the increase in suspension was because one of the drugs which was unlawfully dispensed was a controlled dangerous substance.

7. Rite Aid filed its initial federal complaint on October 18, 1974 and its first amended complaint on January 16, 1975.

8. N.J.S.A. 45:14–1 provides:
 The board of pharmacy of the state of New Jersey, hereinafter in this chapter designated as the "board", established by an act entitled "An act to regulate the practice of pharmacy in this state," approved March nineteenth, one thousand nine hundred and one (L.1901, c. 51, p. 85), as amended and supplemented, is continued. The board shall consist of five members, to be appointed from time to time as hereinafter directed, by the governor, each of whom shall be a citizen of and an able and

skilled registered pharmacist in this state, shall have been registered as a pharmacist in this state for at least five years prior to his appointment, shall be actually engaged in conducting a pharmacy at the time of his appointment and shall continue in the practice of pharmacy during the term of his office. No member shall be a teacher or instructor in any college of pharmacy. Upon the expiration of the term of office of a member, his successor shall be appointed by the governor for a term of five years from June first of the year in which the term of such former member expired, and the term of not more than one member shall expire in any year. Any vacancy in the membership of the board shall be filled for the unexpired term in the manner provided for an original appointment; and the New Jersey Pharmaceutical Association may annually send to the governor the names of three registered pharmacists engaged in the practice of pharmacy in this state and having the qualifications required by this section, one of whom the governor may appoint to fill any vacancy occurring in the board. (Footnote omitted)

quires the majority of the Board's membership to be composed solely of competing independent pharmacists and therefore is unconstitutional on its face and as applied to Rite Aid because such Board members have a personal interest and bias in regulating and adjudicating cases involving Rite Aid. The First Count also alleges that the present Board has manifested its bias against Rite Aid by obstructing new Rite Aid license applications, discriminatorily enforcing the pharmacy laws against Rite Aid and attempting to assess discriminatory penalties.

The Third Count alleges that the Board's investigation, prosecution and adjudication of complaints pursuant to N.J.S.A. 45:14–3, 12 and 35 is unconstitutional.[9]

The Fourth Count alleges that the designation of a hearing officer pursuant to N.J.S.A. 52:14B–10(c)[10] was unauthorized and unconstitutional as the statute fails to delineate standards for the selection of a hearing officer.

The Fifth Count alleges that the Board has enforced the pharmacy statutes against Rite Aid in an unequal, arbitrary and discriminatory manner.

The Complaint seeks the convening of a three judge district court pursuant to 28 U.S.C. § 2281, a declaratory judgment holding N.J.S.A. 45:14–1, 3, 12, 35 and N.J.S.A. 52:14B–10(c) unconstitutional on their face and as applied, injunctive relief restraining the enforcement of these statutes and an order declaring the Board's Decision and Order as to Rite Aid null and void and enjoining its enforcement.[11]

9. N.J.S.A. 45:14–3 provides in pertinent part:
[The Board] may examine into all cases of alleged violations of this chapter and shall cause the prosecution of all persons not complying therewith . . . . .
N.J.S.A. 45:14–12 provides:
The board may refuse an application for examination or may suspend or revoke the certificate of a registered pharmacist or a registered assistant pharmacist for any of the following causes: When the application or registration is shown to have been obtained by misrepresentation or fraudulent means or when the applicant or registrant is guilty of chronic or persistent inebriety, or has been convicted of violating the provisions of any law relating to the sale of liquors, or has been twice convicted of violating any law relating to the practice of pharmacy, or has been convicted of a crime involving moral turpitude, or has impersonated an applicant for registration before the board and the board shall refuse an application for examination or revoke the certificate of a registered pharmacist or a registered assistant pharmacist when the applicant or registrant is shown to be addicted to the use of narcotic drugs, or has been convicted of violating any law of this or any other State or of the United States relating to narcotic drugs. Before a certificate shall be refused, suspended or revoked, the accused person shall be furnished with a copy of the complaint and given a hearing before the board. Any person whose certificate is so suspended or revoked shall be deemed an unregistered person during the period of such suspension or revocation, and as such shall be subject to the penalties prescribed in this chapter, but such person may, at the discretion of the board, have his certif-

icate reinstated at any time without an examination, upon application to the board. Any person to whom a certificate shall be denied by the board or whose certificate shall be suspended or revoked by the board shall have the right to review such action by appeal to the Appellate Division of the Superior Court in lieu of prerogative writ.
N.J.S.A. 45:14–35 provides:
The board may suspend or revoke any permit obtained by false representation made in the application therefor or when the pharmacy or drug store for which a permit shall have been issued is conducted in violation of the provisions of this chapter.

10. N.J.S.A. 52:14B–10(c) of the New Jersey Administrative Procedure Act provides:
When a person not empowered to render an administrative adjudication is designated by the head of the agency as the presiding officer, his recommended report and decision containing recommended findings of fact and conclusions of law shall be filed with the agency and delivered or mailed to the parties of record; and an opportunity shall be afforded each party of record to file exceptions, objections and replies thereto, and to present argument to the head of the agency or a majority thereof, either orally or in writing, as the agency may order. The head of the agency shall adopt, reject or modify the recommended report and decision. The recommended report and decision shall be a part of the record in the case.

11. The Complaint also seeks a mandatory injunction requiring the Governor of New Jersey to reappoint the Board in such a manner as to satisfy all constitutional requirements and compensatory and punitive damages. Rite Aid has

On January 30, 1975 an order constituting a three judge district court was filed. After discovery each party moved for summary judgment on all counts of the complaint. We denied both motions on January 6, 1976. A full plenary trial followed.

## II.

The defendants have argued that the doctrine of equitable restraint requires us to abstain, leaving the plaintiffs to their state remedies. In support of this contention, we are referred to *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and in particular *Huffman v. Pursue,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 *reh. denied,* 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975).

*Younger* involved the enjoining of a state criminal proceeding with which we are not concerned here. *Huffman* extended the *Younger* doctrine to a "state proceeding which in important respects is more akin to a criminal prosecution than are most civil cases." 420 U.S. at 604, 95 S.Ct. at 1208. In *Huffman,* a sheriff and a prosecuting attorney in Ohio sought to close a theatre specializing in the display of allegedly pornographic films which had been adjudged obscene after adversary hearings. The proceeding was brought under a state statute which provided that the exhibition of obscene films constituted a nuisance. The state court determined that the theatre had exhibited obscene films and ordered it closed for a year. Rather than appealing that state court order, an action in federal district court was filed based on 42 U.S.C. § 1983. The plaintiff there sought injunctive relief and a declaration that the Ohio statute was unconstitutional. The district court reached the merits of the controversy and enjoined the theatre's closing. The United States Supreme Court vacated the district court order and remanded for its consideration of *Younger* abstention.

The Supreme Court in discussing the application of *Younger* abstention, which

heretofore had been restricted to criminal proceedings, said:

> The State is a party to the Court of Common Pleas proceeding, and the proceeding is both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials. Thus, an offense to the State's interest in the nuisance litigation is likely to be every bit as great as it would be were this a criminal proceeding. *Cf. Younger v. Harris,* supra, 401 U.S. [37], at 55 n. 2 [91 S.Ct. [746], at 757, 27 L.Ed.2d 669] (Stewart, J. concurring). Similarly, while in this case the District Court's injunction has not directly disrupted Ohio's criminal justice system, it has disrupted that State's efforts to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws. (Footnote omitted.)
>
> 420 U.S. at 604–05, 95 S.Ct. at 1208

Thus, the most recent Supreme Court discussion of *Younger* comity considerations in a civil context extended the reach of the doctrine of equitable restraint only to those civil proceedings which are in aid of, or closely related to, a state's enforcement of its criminal laws. The cases following *Huffman* in which *Younger* abstention was applied, however, have in many instances gone beyond the strict requirement of a criminal nexus. These cases have apparently engrafted onto *Younger* a substitute condition which would require abstention where the state has a strong and peculiar relationship to, or interest in, the existing state proceedings. The courts which have so extended *Younger* equate the identified "strong state interest" with the quasi criminal nexus required by *Huffman.* *Anonymous v. Association of the Bar of City of New York,* 515 F.2d 427 (2nd Cir. 1975) (attorney disciplinary proceedings characterized as "quasi criminal"); *Greene v. Virginia State Bar Association,* 411 F.Supp. 512 (E.D.Va.1976) (3 judge dist. ct.) (attorney disciplinary proceedings); *Niles v. Lowe,*

---

not pursued its request for damage relief, (Stipulation of Parties January 27, 1976) and has

apparently also abandoned its request for a mandatory injunction.

407 F.Supp. 132 (D.Haw.1976) (3 judge dist. ct.) (attorney disciplinary proceedings); *Mildner v. Gulotta,* 405 F.Supp. 182 (E.D.N.Y.1975) (3 judge dist. ct.) (attorney disciplinary proceedings); *McCune v. Frank,* 521 F.2d 1152 (2d Cir. 1975) (police officer disciplinary proceedings); *Ahrensfeld v. Stephens,* 528 F.2d 193 (7th Cir. 1975) (state eminent domain proceedings); *Littleton v. Fisher,* 530 F.2d 691 (6th Cir. 1976) (child custody proceedings); *Burdick v. Miech,* 409 F.Supp. 982 (E.D.Wis.1975) (3 judge dist. ct.) (bastardy proceedings); *Lerner v. Wittig,* 394 F.Supp. 866 (E.D.Wis.1975) (municipal court proceedings).[12]

Presumably, this further extension of *Younger* was based upon the underlying considerations of comity found in *Younger.* However, we are not convinced that the Supreme Court's holding in *Huffman* requires this additional extension of *Younger* to civil cases where a criminal nexus is absent. Nor need we decide whether, if faced with situations similar to those reflected in the cases noted above, we too, would have relied upon a "strong state interest" (as being comparable to a "criminal nexus") to suffice for *Younger-Huffman* abstention.

█ Here the record discloses neither a sufficient criminal nexus nor a sufficiently strong state interest to require abstention.

While we recognize that New Jersey has enacted legislation which provides for criminal penalties for certain activities relating to controlled dangerous substances (*see* N.J.S.A. 24:21–1 et seq.), these provisions are not "closely related to or akin to" the New Jersey statutes regulating the practice of pharmacy. N.J.S.A. 45:14–1 et seq. which regulates the practice of pharmacy in New Jersey appears as a unified, cohesive and comprehensive statutory scheme with its own sanction and penalty provisions. The sanctions and penalties specified are completely civil in nature and are enforced through civil rather than criminal actions. *See, e. g.,* N.J.S.A. 45:14–26.3, 27, 35 and 37.

Moreover, there is no intimation or suggestion in the record that criminal charges against Rite Aid have ever been contemplated during these past 27 months or that criminal charges have ever been employed at any time in aid of enforcement of the pharmacy laws.

Thus, restricting ourselves to the qualifications set forth by the Supreme Court in *Huffman,* there is no reason or basis for our abstaining here.[13]

Furthermore, even if we were inclined to follow the expanded approach of the authorities listed above and seek to abstain on the basis of a "strong state interest", we would not do so here, for as indicated, the record discloses no such interest.

We have here no more than a routine, garden variety state agency administrative proceeding. It is neither quasi criminal in character, (*Anonymous v. Association of the Bar of City of New York, supra*) nor is there present such a strong state interest as can be equated to that interest which a state has in its own criminal proceedings (*Burdick v. Miech, supra* at 984–985). No such special circumstances appear here as might otherwise warrant abstention based on a strong state interest in proceedings involving eminent domain (*Ahrensfeld v. Stephens, supra*), bastardy (*Burdick v. Miech, supra*), child custody (*Littleton v. Fisher, supra*), or attorney discipline

---

**12.** *See also Marks v. Leis,* 421 U.S. 940, 95 S.Ct. 1669, 44 L.Ed.2d 96 (1975) (mem.); *MTM, Inc. v. Baxley,* 523 F.2d 1255 (5th Cir. 1975) (obscenity nuisance cases controlled by the precise holding of *Huffman*).

**13.** We observe additionally that *Huffman* did not arise in an administrative context as did this proceeding. All administrative proceedings here have been concluded. While it is true that the plaintiffs might have sought review in the state courts from the Board's adverse determination, it is equally true that their action could be maintained in federal district court. *See Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (discussed *infra*).

Whatever distinction may or may not obtain by reason of the administrative nature of this proceeding's inception, it is apparent that in *Huffman,* constitutional objections to the proceeding were available to the plaintiff in the state forum. These constitutional objections obviously could not be raised before the Board.

(*Anonymous v. Association of the Bar of City of New York, supra*).

We do not suggest or intimate that New Jersey is unconcerned with the proper regulation of the practice of pharmacy. We assume that New Jersey is as concerned with the regulation of pharmacy as it is concerned with the regulation of all similar professions and occupations. (*See* N.J.S.A. Title 45 generally). However, that concern, unless evidenced by a stronger state interest than appears in this record, is insufficient to meet the abstention requirements of even those cases which have extended *Younger* beyond *Huffman*. Were we to hold otherwise on a record such as this, we would be expanding the doctrine of *Younger-Huffman* abstention to all and every state agency proceeding regardless of its nature. This we decline to do.

■ Nor do we think this Court should exercise its equitable discretion under *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In *Pullman* the Supreme Court held that where an interpretation by the state courts of an unresolved question of state law may avoid the necessity of deciding a constitutional question, the federal court should abstain from adjudicating the constitutional question until the state courts could interpret the statute. "Pullman abstention", however, is founded on the exercise of the equitable discretion of the district court, *Baggett v. Bullitt*, 377 U.S. 360, 375–76, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), and is not required where it is unlikely that the resolution of the state law question will significantly affect the federal constitutional claims. *Harris County Commissioners Court v. Moore*, 420 U.S. 77, 83–84, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). *See also Bellotti v. Baird*, —— U.S. ——, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

■ The pertinent state law here, N.J. S.A. 45:14–1, provides for the membership of the Board of Pharmacy:

The board shall consist of five members, to be appointed from time to time as hereinafter directed, by the governor, each of whom shall be a citizen of and an able and skilled registered pharmacist in this state, shall have been registered as a pharmacist in this state for at least five years prior to his appointment, *shall be actually engaged in conducting a pharmacy at the time of his appointment* and shall continue in the practice of pharmacy during the term of his office. (Emphasis added.)

In its Complaint, Rite Aid alleged that this statute discriminates against chain store pharmacies in that pharmacists employed in such establishments may not be chosen to serve as members of the Board of Pharmacy. Second Amended Complaint, First Count, ¶ 7. Rite Aid predicates its contention on the requirement that members be "engaged in conducting a pharmacy" which it interprets as meaning that the pharmacist must be the owner of the pharmacy.

While the courts of New Jersey have not yet construed this clause, the Governor has appointed pharmacists to the Board who did not own their own pharmacies.[14] This Executive interpretation notwithstanding, we think that a definitive construction of the statutory language by the New Jersey courts would not avoid the necessity of deciding the constitutional questions which Rite Aid has raised.

Rite Aid contends that N.J.S.A. 45:14–1 is facially unconstitutional because it requires that pharmacists regulate their business competitors and is unconstitutional as applied (to Rite Aid and to chain stores in general) because independent pharmacists are required to regulate chain store pharmacies.[15] Because of the sweep of Rite

**14.** Since 1964, three members of the five pharmacist Board members were not owners of pharmacies at the time of their appointment.

**15.** To adopt Rite Aid's formulation under the existing statutory scheme would mean that no

independent members or chain members could be appointed to the Board. For in every instance, and no matter the controlling number, one segment of the practice would always be regulating the other.

Aid's claims of unconstitutionality it would make no difference as to which construction a court placed on N.J.S.A. 45:14–1. Given either construction, Rite Aid's constitutional claims are without merit (*see* discussion *infra*). Thus, abstention here would only delay ultimate adjudication on the merits, *see Baggett v. Bullitt, supra,* 377 U.S. at 375–379, 84 S.Ct. 1316, 12 L.Ed.2d 377. Since we are satisfied that abstention could not result in any construction of N.J.S.A. 45:14–1 by the New Jersey courts which could avoid the constitutional questions raised, it would be inappropriate to exercise *Pullman* abstention.

### III.

Rite Aid first attacks N.J.S.A. 45:14–1 on its face as being in violation of the due process clause of the Fourteenth Amendment, because the statute requires that pharmacists be regulated and disciplined by a board composed primarily of competitors. Thus, argues Rite Aid, the Board members are necessarily biased and can neither be impartial in their regulatory functions nor in adjudicating alleged violations of the Pharmacy Act by plaintiffs and other non Board-member pharmacists.

 It is fundamental that one accused of violating the law is entitled to a fair trial in a fair tribunal. *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). In achieving that standard we have sought to prevent not only actual bias, but also the appearance of bias. *In re Murchison, supra* at 136, 75 S.Ct. 623. To this end, the Supreme Court has stated that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused, deprives the latter due process of law." *Tumey v. Ohio, supra,* 273 U.S. at 532, 47 S.Ct. at 444. It is clear that where the adjudicator has a substantial pecuniary interest in the outcome, the probability of actual bias is too high to be constitutionally tolerable. *Withrow v. Larkin,* 421 U.S. 35, 46–47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975);

*Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

 We do not believe that the Board, consisting as it does of five pharmacists and two lay persons as required by N.J.S.A. 45:14–1, creates a situation of probable bias in the regulation of pharmacists. The claim made by Rite Aid is similar to the argument advanced by the plaintiff in *Kachian v. Optometry Examining Board,* 44 Wis.2d 1, 170 N.W.2d 743, 747–48 (1969). In this argument Rite Aid is not claiming actual bias but rather contends that ". . . there is an inbuilt, inescapable even if indirect, financial interest involved when [a pharmacist] board member sits in judgment on a fellow-[pharmacist]." *Kachian,* 170 N.W.2d at 747–48.

Admittedly, the practice and conduct of a retail pharmacy primarily involves commercial activity in which various retail pharmacies compete for customers. *Cf. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). However, mere theoretical competition alone has never been a sufficient predicate for an inductive conclusion of probable economic bias. *Apoian v. State,* 235 N.W.2d 641 (S.D. 1975); *Blanchard v. Michigan State Bd. of Exam. in Optometry,* 40 Mich.App. 320, 198 N.W.2d 804 (1972); *Kachian v. Optometry Examining Board, supra.*

Rite Aid, however, argues that *Gibson v. Berryhill, supra,* and *Wall v. American Optometric Association, Inc.,* 379 F.Supp. 175 (N.D.Ga.) (3 judge dist. ct.) aff'd mem. 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974), support its facial attack on the N.J.S.A. 45:14–1. We cannot agree.

*Gibson v. Berryhill* involved a disciplinary proceeding against a non-self-employed optometrist who was not, and could not become a member of the Alabama Optometric Association. The disciplinary proceeding was conducted by the Alabama Board of Optometry whose members were limited by statute to members of the Association, which itself, limited its members to self employed optometrists. Thus, out of Ala-

bama's 192 practicing optometrists, only the 100 Association members were eligible for appointment to the Board. On that record, the Supreme Court agreed "that the pecuniary interest of the members of the Board of Optometry had sufficient substance to disqualify them, given the context in which [the] case arose." 411 U.S. at 579, 93 S.Ct. at 1698.

In *Wall v. American Optometric Association, Inc., supra,* the members of the Georgia State Board of Examiners in Optometry were traditionally chosen by the governor from among the members of the Georgia Optometric Association, a private organization which was composed of "dispensing" as contrasted with "prescribing" optometrists.[16] Thus, out of Georgia's 300 optometrists, only the 200 members of the Association were eligible for appointment to the Board which regulated the practice of optometry. In this circumstance, the district court found that the board members had a substantial pecuniary interest and hence could not be "called disinterested in the outcome of plaintiffs' license revocating proceedings." 379 F.Supp. at 189.

It is clear that both *Gibson* and *Wall* involve constitutional attacks addressed not to the face of the statutes involved, but rather to the manner in which they were applied. In neither case did the courts rest their holdings on the fact that mere board membership of individuals in the identical profession as those to be regulated, created a temptation to be biased.[17]

There is nothing that appears on the face of N.J.S.A. 45:14–1 to indicate the presence of that kind of substantial pecuniary interest which was found to disqualify board members in *Gibson* and *Wall*. As in *Gibson* and *Wall*, to determine if such an interest exists, we must look to more than the mere words of the statute. Evidence is required. Recognizing that the plaintiffs here attack the statute on both facial and "as applied" grounds, we therefore ordered the taking of evidence to afford the plaintiffs an opportunity to prove, if they could, the existence of the required substantial pecuniary interest. We treat with that argument *infra*.

In connection with the instant facial attack, however, we have been shown no basis for us to require the disqualification of board members just by reason of their sharing the same profession as plaintiffs.[18] Nor have we been shown any authority which holds that, as a matter of law, mere self regulation of a profession without more, violates due process. We decline to so hold and therefore reject Rite Aid's facial argument.[19]

**16.** Dispensing optometrists distribute eyeglass lenses and frames; prescribing optometrists, who are often associated with commercial enterprises including department stores, do not. *Wall, supra* at 178.

**17.** Rite Aid also argues that even if N.J.S.A. 45:14–1 is held constitutional on its face, it nevertheless is unconstitutional as applied. In that argument, discussed *infra*, it again relies on *Gibson* and *Wall*.

**18.** While we see nothing on the face of N.J.S.A. 45:14–1 which violates due process, we, of course, do not foreclose the plaintiffs from arguing that an individual Board member has a substantial pecuniary interest or bias in the outcome of any Board proceeding. Such an argument, however, will not be entertained by us as a panel convened pursuant to 28 U.S.C. § 2281. *Ex Parte Bransford,* 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249 (1940), Wright, *Federal Courts,* § 50 at 190. *See also* our discussion *infra*.

**19.** The ultimate effect of Rite Aid's argument would be to prevent states from regulating professions with Boards made up of members of that profession, an argument more appropriately addressed to the legislature. We note in this regard the reply of Justice Hansen writing for the Supreme Court of Wisconsin in *Kachian v. Optometry Examining Board, supra,* 170 N.W.2d at 748:

'Ain brera' is a Hebrew expression, meaning 'What are the alternatives?' If the indirect interest deriving from membership in the profession or occupation being regulated disqualifies an individual from serving on a regulatory board, the result would be dentists could not examine dentists, attorneys could not serve on bar examiner boards, pharmacists could not give pharmacy examinations. Would it be preferable, or even workable, to have the dentists giving bar examinations and optometrists given pharmacy tests? The gain in presumed purity would be matched by a loss in knowledge and experience in drafting and administering professional and

## IV.

■ The main thrust of Rite Aid's complaint is that it is constitutionally impermissible for independent pharmacists to regulate chain store pharmacies in general and Rite Aid pharmacies in particular.

To succeed in this argument, Rite Aid must establish that the statute "as applied", results in a violation of due process in that the members of the Board have such a substantial pecuniary interest that they cannot be impartial or disinterested in the outcome of any proceeding involving Rite Aid or any other chain store. We therefore examine the record made before us to determine whether such a substantial pecuniary interest has been proved.

In view of Rite Aid's position, we would have expected that the proofs would reveal, at the least, evidence bearing upon:

1) The total dollar volume of pharmacy sales in New Jersey, and Rite Aid's (and other chains') share of that volume, with appropriate economic projections.

2) The essential nature of the practice of pharmacy in terms of customer and physician custom, trade practices (including credit, and prescription and non-prescription pricing and discounts), competition, location, convenience, etc.

3) The effect, if any, of chains on large, as well as small independents; the effect of multi-store independents and the overall effect of geographic locations on any of these categories.

4) All demographic factors and relevant market and other economic considerations as affect the relationship of chains to independents in the instant context, including, perhaps, evidence of surveys or feasibility studies revealing the basis of customer or physician preference in the choice of a pharmacy.

occupational rules and regulations. (Footnote omitted.)

**20.** The evidence reveals that in 1975 Rite Aid apparently grossed 9½ million dollars in prescription sales out of a total gross volume of approximately 45 million dollars. However, Rite Aid itself did not have available the total dollar volume of prescription sales in New Jersey. The record is similarly silent as to all other sales by chains and independents.

By no means are these evidential suggestions intended to be exhaustive or all inclusive. Nor would we expect or require introduction of material from every evidentiary category mentioned. However, while the plaintiffs have produced evidence in respect to some particulars in order to satisfy their burden, they were required to develop a record from which we could find that by reason of the intrinsic competitive nature of the practice of pharmacy, any independent pharmacist, (no matter how small or large his own establishment, no matter where it is located *vis a vis* a Rite Aid store or any other chain or multi-independent pharmacy, and no matter the relevant trade practices or customs) would be so economically affected by the establishment of a Rite Aid or other chain store *anywhere in New Jersey* that he could not be impartial in deciding the outcome of a proceeding involving Rite Aid.

Our examination of the record reveals that plaintiffs have fallen far short of carrying this burden. *Government of Virgin Islands v. Testamark*, 528 F.2d 742, 744 (3d Cir. 1976).

Perhaps the most significant omission from the record before us is the absence of any evidence from which we could determine the proportionate share of the dollar market in New Jersey held by Rite Aid in particular[20] and the pharmacy chains in general. This record is completely barren of information as to whether Rite Aid controls 1%, 5%, 10%, or 50% of the pharmacy dollar volume in New Jersey. It is obvious that if Rite Aid's dollar volume is but a minute fraction of the total dollar volume generated by pharmacies, the pecuniary interest of competitive pharmacists is far less than if Rite Aid controls 25 to 50% of the market.[21] *See Gibson* and *Wall, supra.*

**21.** We do not intend by this illustrative comment to indicate any particular percentage that may be deemed required or sufficient to satisfy a substantial pecuniary interest. Obviously the percentage of market control is but one factor, *albeit* in this case, an indispensable one, in the overall analysis.

The record before us discloses only that there are 168 retail pharmacies out of 1,560 (10.8%) in the state that are owned and operated by chains. Of these 168 pharmacies, Rite Aid owns 51 (having grown from two stores in 1966) and thus operates 3.3% of the retail pharmacies in this state. The record also reveals that Rite Aid advertises on a statewide basis its discount prices for nonprescription items.

However, the evidence shows that despite its discounting practices and advertising, Rite Aid's percentage of all prescriptions filled in New Jersey by all pharmacies has been but 3.4 to 3.5%; a proportion commensurate with its number of pharmacies.[22]

This data, of course, deals only with Rite Aid's percentage of the prescription market. As we have just pointed out, the record is completely silent as to the percentage of the total pharmacy dollar volume held by (1) the chains and (2) by Rite Aid.

Nor does the other evidence introduced remedy this deficiency. That evidence may be summarized as follows:

Timothy Noonan, Rite Aid's Vice President for Pharmacy Operations, testified as to the growth and location of the Rite Aid stores in New Jersey. He described Rite Aid's extensive advertising of discounts in newspapers, and on radio and television. The Rite Aid prices for nonprescription items are discounted 15 to 35%. Noonan testified that Rite Aid's prescription prices are 15 to 20% lower than those charged by the average independent.

Noonan stated that Rite Aid recruits personnel for its stores by offers of higher salaries and greater benefits than those provided by the independents. Rite Aid employs about 900 people in its New Jersey stores of which approximately 90 are pharmacists.

In Noonan's opinion, location and price were the two most important factors governing the customers' selection of pharmacies. Customers' choices are also affected by advertising, inventory, personnel and atmosphere, but not to the same extent as location and price. He believed that due to Rite Aid's lower prices and advertising, its stores were in competition with most of the pharmacies in the state.

However, even given Rite Aid's highly competitive ability, Noonan admitted that 60% of Rite Aid's customers do not purchase their prescriptions in the Rite Aid store where they buy nonprescription items. Furthermore, Noonan testified that he did not know as a fact that particular Rite Aid stores had drawn customers away from local independents.

Franklin Brown, Vice President and General Counsel for Rite Aid, testified as to the national growth of Rite Aid. He also described what he believed was a "freeze" placed on the processing of applications for Rite Aid stores by the Board as a result of the violations found in the Bergenfield store.

In addition to the testimony of Noonan and Brown, Rite Aid introduced portions of depositions of five of the pharmacist Board members in order to show concern by independents about the growth of Rite Aid. We discuss some aspects of these depositions *infra.*

Paul Pumpian the Secretary of the Board of Pharmacy testified on behalf of the state. His testimony covered many areas of the Board's functions, but we refer here to just those portions material to Rite Aid's claims.

22.

| Prescriptions Filled | | |
| --- | --- | --- |
| All N.J. Pharmacies | Rite Aid | Rite Aid % |
| 1972 36,231,986 | not given | |
| 1973 38,214,015 | 1,278,000 | 3.5% |
| 1974 46,645,063 | 1,600,000 | 3.4% |
| 1975 not given | 1,800,000 | |

The evidence introduced by Rite Aid does not support its contention that Rite Aid stores are taking prescription sales away from independents.

He testified that in the two years preceding the Bergenfield hearing none of the 35 disciplinary proceedings heard by the Board involved chain stores. He testified that two previous members of the Board did not own their own pharmacies and that Mr. Rothberg who is presently a member of the Board does not own his own pharmacy.

As to complaints, Pumpian testified that they were investigated not by the Board but by the Enforcement Bureau of the Division of Consumer Affairs. Pumpian recalled that while he received complaints by independents against Rite Aid, he received more complaints from independents against other independents.

Mrs. Vivian Petro, a lay member of the Board for three and a half years, testified that Board members displayed no special interest in one type of pharmacy over another with respect to regulation or discipline.

The other testimony adduced, while interesting, does not bear directly on Rite Aid's "as applied" argument. Rite Aid did inform us of certain disciplinary actions being pressed against certain of the Board members but we fail to appreciate the significance of these facts in the "as applied" setting.[23]

This record is clearly distinguishable from *Gibson* and *Wall*. In *Gibson*, the district court determined that the aim of the board was to revoke the licenses of nearly 50% of the optometrists in Alabama because they were salaried employees of business corporations and not self employed as were the members of the board. A temptation for bias was found because the removal from practice, and hence competition of all salaried optometrists which constituted approximately 50% of the total number of optometrists was likely to lead to the economic advantage of the optometrists in private practice.[24] Thus, the pecuniary interest of the members of the Board of Optometry composed solely of private practitioners who stood to benefit from the suspension of the salaried optometrist's licenses was so substantial as to require their disqualification.

Like *Gibson, Wall v. American Optometric Association, Inc., supra* involved an attempt by the regulatory board to eliminate from competition a large segment of the optometry profession in Georgia. As previously set forth the board members in *Wall* were chosen from an association which excluded one third of all optometrists from its membership. The district court correctly concluded that the association members had a substantial financial interest which precluded them from regulating non-association members. Furthermore, the court specifically found that

If plaintiffs were prevented from practicing optometry in Georgia, their patients would have to seek optometric services from others. Concededly, some of these patients would turn to non-members of the [Association] for optometric services. Some would probably go to ophthalmologists. Possibly some, who live near the borders of the state, might go outside the state. But it cannot be disputed that

---

**23.** Even if relevant to this argument, the most Rite Aid achieved was to point out the possibility of inconsistent enforcement. In light of the actions taken against the Board members here, we are hard pressed to accept this argument. As the Supreme Court of Wisconsin stated in *Kachian, supra*, when faced with a similar argument:

The plaintiff introduced testimony to the point that three members of the board had themselves failed to fully comply with the minimum examination rule in making eye examinations in their private practice. . . However, inconsistencies in enforcement, like inconsistencies in decisions, however regrettable, do not, standing alone, invalidate an otherwise valid regulation. There must, in addition, be a clear indication of intentional or purposeful discrimination. (Footnotes omitted.)

170 N.W.2d at 747.

This record does not establish intentional or purposeful discrimination any more than it establishes a substantial pecuniary interest on the part of Board members which would require disqualification.

**24.** The district court in *Gibson* also found that the suspension of the licenses under consideration would result in additional business for the defendant board members. 331 F.Supp. 122, 126 (M.D.Ala.1971). As discussed, *supra*, there is no basis for such a finding on this record.

some would turn to the defendants and their fellow members of the [Association]. Although it is impossible to determine in advance exactly what the benefit to the [Association] would be if the licenses of all the plaintiffs were revoked, we think it impossible to characterize the benefit, as the defendants have, as "remote and speculative." Plaintiffs have thousands of patients. Those patients would go somewhere, and there is a substantial likelihood that many of them would go to the defendants with their patronage. In such a situation, we find it inconceivable that the defendants could be called disinterested in the outcome of plaintiffs' license revocation proceedings.

379 F.Supp. 175, 188–89.

Unlike *Gibson* and *Wall*, the record here does not demonstrate that the independents are taking concerted action to eliminate competition from either the chains (10.8% of all pharmacies) or Rite Aid (3.3% of all pharmacies). Nor does the record indicate that the suspension of the Rite Aid Bergenfield permit will result in any personal or financial benefit to the members of the Board.[25]

Rite Aid, however, further argues that the independents fear chains and hence Rite Aid, and are desirous of protecting themselves against the alleged threat of Rite Aid's expansion. To support this argument, Rite Aid relies on the testimony of three Board members.[26] However, we read that testimony as highly equivocal and conjectural. In essence, while Rite Aid contends this is "hard" testimony revealing a pronounced fear of an antipathy toward chain stores, we cannot agree. A fair reading of the testimony taken on deposition leaves us with no more than an impression that some independents "talk" about chains and dislike competition. No identification is made of the independents or their number who harbor a fear of chains or Rite Aid, and we could not, on the quality of this evidence,

find that pervasive bias *throughout* the independent constituency in the pharmacy practice as would require disqualification of all independent board members.

Characteristic of the testimony is that of Board members Campbell and Sussman. Campbell testified in part:

Q Have any owners of individual pharmacies such as your own discussed with you the growth of Rite Aid Pharmacies in New Jersey?

A I can't recall specifically.

Q Well, has the subject ever come up at any time that you can recall?

A I have heard it.

Q What have you heard?

A That they're expanding, probably at association meetings.

. . . . .

Q Mr. Campbell, what would be the effect of a Rite Aid opening in your geographical area? How would that affect your business?

A That's speculative, I don't know. We have had two so-called discount operations right in our back yard in the same location, Sun Ray, and they abandoned the site and Thrift moved in and our volume has never—our gross has remained the same or increased over that period of time.

Q Do you know whether or not any of the individual Board members are located near to a Rite Aid Pharmacy?

A I don't know.

Q Getting back to the conversations that you had regarding the size of Rite Aid and the pricing practices of Rite Aid and the growth of Rite Aid, do you recall how often you might have had those conversations?

A Not often, no.

Q More than once, though?

A Probably more than once.

---

25. The proper procedure in such a case would be to seek the disqualification of the interested Board members. *See* n. 18 *supra*, and § VI *infra*.

26. *See* Silnutzer dep. at 33–34; Sussman dep. at 13, 29; Campbell dep. at 82–90. This "fear" has been the subject of articles in pharmacy trade journals. Silnutzer dep. at 36.

Q And this conversation would be in the context of the business interest of the particular individual with whom you were speaking. Is that right?

A You mean as viewing them as competition?

Q Yes.

. . . . .

Q In fact, Mr. Campbell, isn't there an antipathy between an individual owner of a pharmacy and a chain store pharmacy?

A Now I'm giving my age away. When I first became active in the county and state association there was a strong feeling of resentment as the chains were growing, but—and I remember years ago, chain store pharmacies were afraid to apply for membership in our association, this isn't true. Right now the president of our local county manager [sic] has been the manager of a Thrift store in Trenton and he's one of the most highly regarded men in the association. As I say, he's our president.

Q That doesn't dilute the fact that there's still this feeling between the individual—on the part of the individual owner that the chain store is jeopardizing their business, that feeling exists, doesn't it, Mr. Campbell?

A Sure it exists, but it's subsiding.

. . . . .

Q This feeling of antipathy is something not only you but other members of the Board of Pharmacy are aware of?

A Yes, we're aware of it.

Q And how do you become aware of this feeling of antipathy?

A Well, we're—we're members of the Board of Pharmacy but we—that occupies only a small part of our time. We're all engaged in operating our own pharmacies and we see, and talk to other pharmacists, other pharmacy owners.

Q What do they tell you? Do they tell you that Rite Aid is a big competitor, we're concerned about that? Do they tell you things like that?

A Not in—not in my personal observation because, as I say, there's only one—as far as I know there's only one Rite Aid store within any distance, I'd say fifteen or sixteen miles, and none others around.

Q Let me rephrase the question.

Instead of just Rite Aid do these individual owners you talk to, do they tell you that the chain store is a threat to them, they're concerned about the chain store and it jeopardizes their business? Do they tell you things like that?

A Some do. It's not a big part of our life. Campbell dep. at 82, 85–86, 87–89.

In part, Sussman testified:

Q Did they say anything beyond the fact that Rite Aid's prices are less than prices of individually owned pharmacies?

A No.

Q Did anyone indicate that that might be a threat to their business?

A No.

Q Did anyone indicate that it might tend to divert their business?

A I don't recall that specifically. It—

Q Generally, Mr. Sussman, I'm not asking you to recall specifically what was said and who said it, just generally.

A It could possibly dilute their business.

Q Did anyone say that to you?

A No.

Q But you recognize nevertheless that the pricing policy of Rite Aid because it is lower than individually owned pharmacies could tend to dilute the business of individually owned pharmacies, correct?

A There is a possibility.

Q You recognize that possibility, do you not, Mr. Sussman?

A What?

Q You recognize that possibility, do you not?

A Yes.

Q Do you know whether other members of the Board of Pharmacy recognize that possibility?

A I don't know.

Q Have you ever shopped at Rite Aid Pharmacy to compare their prices with yours?

A No.

Q Has anyone on the Board of Pharmacy shopped at Rite Aid Pharmacies?

A Not to my knowledge.

Sussman dep. at 28–29.

Assessing the record as a whole with a recognition of Rite Aid's burden, we find that among the members of the pharmacy profession, there has developed no such pervasive bias against, or fear of, chain stores of Rite Aid as would taint or prejudice pharmacist members appointed from the overall pharmacy constituency to serve on the Board. Nor does this record establish any such pervasive economic effect exercised by the chains upon the independents, as is claimed by Rite Aid. As a consequence, we can find no more than the existence of normal competition with its normal and traditional fears and concerns among independents, large and small, and chains.

Thus, we are forced to conclude on the present record that a chain store poses no greater financial threat to an independent pharmacy than the financial threat posed by another competing independent.

Accordingly, we cannot say that participation on the Board of Pharmacy by an independent member in a case involving Rite Aid or any other pharmacy chain implicates the type of substantial pecuniary interest discussed in *Gibson* and *Wall*[27] which would violate due process.

## V.

Rite Aid also challenges the constitutionality of the application to it of N.J.S.A. 45:14–3, 12 and 35.[28] These statutory provisions give the Board the power to investigate alleged violations of the pharmacy laws and to suspend or revoke licenses and permits as penalties for violations.[29] Rite Aid contends that these statutes were unconstitutionally applied to it insofar as they permitted the Board members to prejudge the allegations against Rite Aid. We reject Rite Aid's argument, as we are satisfied that the procedures employed by the Board were not constitutionally defective.

In *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) the Supreme Court held that a state medical examining board which conducted an investigation into alleged improprieties to determine whether there was probable cause to hold a hearing as to whether a physician's license should be revoked could, consistent with due process, conduct the adversary revocation hearing. The Court instructed:

No specific foundation has been presented for suspecting that the Board had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of the evidence to be presented at the contested hearing. The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fair-

---

**27.** *See also Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

**28.** N.J.S.A. 45:14–3 provides in pertinent part: [The board] may examine into all cases of alleged violations of this chapter and shall cause the prosecution of all persons not complying therewith . . . .
N.J.S.A. 45:14–12 provides in pertinent part: The board may refuse an application for examination or may suspend or revoke the certificate of a registered pharmacist or registered assistant pharmacist for any of the following causes . . . .
N.J.S.A. 45:14–35 provides in pertinent part:

The board may suspend or revoke any permit . . . when the pharmacy or drug store for which a permit shall have been issued is conducted in violation of the provisions of this chapter.
The Third Count of Rite Aid's Second Amended Complaint attacked these statutory provisions as unconstitutional on their face and as applied. Subsequent to the Supreme Court's decision in *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), Rite Aid withdrew its facial attack upon the statutes. (Rite Aid's br. at 46.)

**29.** The Board may also assess monetary penalties. N.J.S.A. 45:14–37.

ness of the board members at a later adversary hearing. Without a showing to the contrary, state administrators, 'are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.'

421 U.S. at 55, 95 S.Ct. at 1468. *Withrow v. Larkin* thus stands for the principle that the mere fact that the administrative agency has investigated the matter in question does not render it or its members incompetent, consistent with due process, to adjudicate the case as presented at the evidentiary hearing. *Burnley v. Thompson,* 524 F.2d 1233, 1241–42 (5th Cir. 1975); *Fuentes v. Roher,* 519 F.2d 379, 388 (2d Cir. 1975); *Stebbins v. Weaver,* 396 F.Supp. 104, 113–14 (W.D.Wis.1975). *See also Hortonville Joint School District No. 1 v. Hortonville Education Association, supra.* We think that *Withrow* disposes of Rite Aid's argument.

We recognize from the start that the actual investigation of Rite Aid was not conducted by the Board.[30] The record reveals that the Board's Secretary, Paul Pumpian, at the request of the Board referred two complaints concerning Rite Aid of Bergenfield to the Enforcement Bureau of the Division of Consumer Affairs for investigation. The Enforcement Bureau is not a part of the Board but does independent investigative work for the nineteen New Jersey professional boards. The Enforcement Bureau thereafter submitted its report to the Board, which in turn forwarded the report to the Attorney General for the institution of disciplinary proceedings.

Rather than hearing the matter itself, the Board appointed a retired Superior Court Judge to act as a hearing officer and to make a report with proposed findings. The Board thereafter reviewed Judge Mintz's report and, with the exception of the penalty recommendations, affirmed it.[31]

We conclude that *Withrow v. Larkin* controls this issue and that N.J.S.A. 45:14–3, 12 and 35 are not unconstitutional "as applied" to Rite Aid.

## VI.

■ The First Count of Rite Aid's Second Amended Complaint, $8 and the Fifth Count may be read as alleging that the Board has manifested actual bias (as distinct from "inferential" bias. *See* § III– V, *supra* ) against Rite Aid. In support of these allegations, Rite Aid introduced testimony which it claims tends to show the actual bias of the present pharmacist board members.

While such evidence of individual actual bias is irrelevant to a successful constitutional attack on N.J.S.A. 45:14–1, proof of such actual bias would nonetheless result in a deprivation of Rite Aid's due process rights. Such an attack against the Board's order, however, does not involve the facial or "as applied" constitutionality of any state statute. A three judge district court under 28 U.S.C. § 2281 may not be convened to adjudicate a request for an injunction against an order of a state administrative board if the constitutional challenge is to a wrong done by the board under the statute, rather than a wrong resulting from

---

**30.** Here as in *Withrow,* the actual investigative work was not performed by the board members. In *Withrow* a board employee conducted the investigation. Here the investigation was undertaken by a bureau independent from the Board. Referring to this circumstance, the Supreme Court noted:

While not essential to our decision upholding the constitutionality of the Board's sequence of functions, these facts, if true, show that the Board had organized itself internally to minimize the risks arising from combining investigation and adjudication, including the possibility of Board members relying at later suspension hearings upon evidence not then fully subject to effective confrontation.

421 U.S. at 54, n. 20, 95 S.Ct. at 1468, n. 20.

**31.** Rite Aid additionally argues that the board reviewed the investigation report *ex parte* and thus considered additional allegations against its Bergenfield store which it could not separate from its eventual consideration of the hearing officers' report. We do not think this *ex parte* submission worked a deprivation of due process. The Board members themselves could have conducted the investigation consistent with *Withrow* and would have learned of these allegations that never became part of the administrative complaint.

the requirement of the statute itself. *Ex Parte Bransford*, 310 U.S. 354, 359, 60 S.Ct. 947, 84 L.Ed. 1249 (1940).

Having upheld the validity of N.J.S.A. 45:14–1 on its face and "as applied", we decline to rule on those allegations of the First and Fifth Counts which challenge the constitutionality of the Board's order of December 6, 1974 by asserting that the members of the Board were actually biased against Rite Aid. That issue is not appropriate for us to consider. It is more properly presented to a single judge of the district court. *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *United Artists Corporation v. Proskin*, 363 F.Supp. 406, 409–10 (N.D.N.Y.1973) (3 judge dist. ct.); *BBS Productions, Inc. v. Purcell*, 360 F.Supp. 801, 806 (D.Ariz.1973) (3 judge dist. ct.). Accordingly, if pressed by Rite Aid, it will be the district court's function to resolve any actual bias issue. We express no opinion, however, as to any factual or legal aspect bearing upon this question.

### VII.

■ The Fourth Count of Rite Aid's Second Amended Complaint alleges that N.J.S.A. 52:14B–10(c) governing the procedure where hearing officers are used, is unconstitutional in that "the statute fails to delineate guidelines or standards the Board must adhere to in making its designation" of a hearing officer. N.J.S.A. 52:14B–10(c) provides:

(c) When a person not empowered to render an administrative adjudication is designated by the head of the agency as the presiding officer, his recommended report and decision containing recommended findings of fact and conclusions of law shall be filed with the agency and delivered or mailed to the parties of record; and an opportunity shall be afforded each party of record to file exceptions, objections and replies thereto, and to present argument to the head of the

agency or a majority thereof, either orally or in writing, as the agency may order. The head of the agency shall adopt, reject or modify the recommended report and decision. The recommended report and decision shall be a part of the record in the case.

As previously stated, the Board had referred the Rite Aid violation to a hearing officer, Judge Mintz, who had been selected from the Attorney General's list of retired Superior Court judges.

Rite Aid's final argument attacks the appointment of Judge Mintz under N.J.S.A. 52:14B–10(c) in two respects. First, it argues that the statute is an unlawful delegation of legislative authority in that the statute provides no standards to govern the selection of a hearing officer. Second, Rite Aid argues that the statute violates due process because it allows the Board to act in an arbitrary manner in selecting a hearing officer. Neither of these contentions have merit.

■ While it is true that the Article 1, § 1 of the United States Constitution precludes Congress from delegating power to administrative agencies without adequate standards for its exercise, *see Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), such a limitation does not apply to the delegation of authority by state legislatures. The separation of powers doctrine stemming from Article 1, § 1 is a limitation only on the federal government and is not applicable to the states.[32] *Sweezy v. New Hampshire*, 354 U.S. 234, 255, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *Snell v. Wyman*, 281 F.Supp. 853, 864 (S.D.N.Y.1968) (3 judge dist. ct.) *aff'd mem.* 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969).

■ The second attack against N.J.S.A. 52:14B–10(c) relies upon the due process clause. We have difficulty understanding this argument, because as we read

---

**32.** Rite Aid does not argue that the delegation of authority to the administrative agency is in violation of state law. *See Cammarata v. Essex County Park Comm'n*, 26 N.J. 404, 140

A.2d 397 (1958). Such a claim in any event would be inappropriate for a statutory three judge district court to consider. See VI., supra.

that statute it is not concerned with the selection of hearing officers but rather provides for the procedures to be followed after a hearing officer has been selected. The authority for the Board to utilize hearing officers would appear to stem from the Board's general power to employ appropriate procedures to hear matters coming before it. N.J.S.A. 45:14–3; *In re Shelton College,* 109 N.J.Super. 488, 263 A.2d 810 (App.Div.1970).

Inasmuch as we do not read this statute as providing for the utilization or selection of hearing officers, we see no reason to extend our discussion to or to adjudicate its constitutionality.

### VIII.

Having concluded that the record developed before us is insufficient in all respects to warrant our holding the challenged statutes unconstitutional, we will enter judgment for the defendants on Counts Two, Three, Four and so much of Counts One and Five as do not implicate considerations of individual actual bias. As to Counts One and Five, we will remand to the district court for proceedings before a single judge consistent with this opinion.[33]

An appropriate order will be submitted within ten (10) days by defendants. Costs will be taxed in favor of the defendants and against the plaintiffs.

STERN, District Judge (dissenting).

While I agree with the result reached by the Court in Part II of its opinion, though for different reasons, I respectfully dissent from the opinion and judgment on the merits.

### I

In my view the Court properly rejects the contention that it must stay its hand in this case. I write on this point only because of the Court's analysis of the *Younger-Huffman* doctrine of federal non-intervention.

Defendants urge the Court to abstain from deciding this case on the basis of the doctrine of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its companion cases, that federal courts should not interfere in ongoing state criminal proceedings. The Supreme Court extended the ambit of *Younger* to certain civil proceedings "in aid of and closely related to criminal statutes" in *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604, 95 S.Ct. 1200, 1208, 43 L.Ed.2d 482 (1975). The Court has made clear, however, that such deference should not be afforded state administrative proceedings. *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Huffman v. Pursue, Ltd., supra.* In *Huffman,* Mr. Justice Rehnquist began his opinion for the Court with the following observation:

> This case requires that we decide whether our decision in *Younger v. Harris,* 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669] (1971), bars a federal district court from intervening in a state civil proceeding such as this, when the proceeding is based on a state statute believed by the District Court to be unconstitutional. A similar issued was raised in *Gibson v. Berryhill,* 411 U.S. 564 [93 S.Ct. 1689, 36 L.Ed.2d 488] (1973), but we were not required to decide it because there *the enjoined state proceedings were before a biased administrative panel which could not provide a necessary predicate for a Younger dismissal, that is "the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved." Id.*

420 U.S. at 594, 95 S.Ct. at 1203 (emphasis added).

The State conceded at oral argument that the Board of Pharmacy could not have ruled itself unconstitutional, even if plaintiffs had requested relief from the Board before coming here. (Tr. 2/28/75: 9) Since the federal issue involved in this case is whether the composition of the Board of Pharmacy denies plaintiffs due process of law, the Board's inability to rule itself unconstitutional ·necessarily disqualifies that body from the category of "competent state

---

**33.** This opinion includes our findings of fact as well as our conclusions of law.

tribunal" for *Younger-Gibson-Huffman* purposes. (*See ante,* at 1167, n. 13)

More important, there is no pending state proceeding of any kind to which this Court could conceivably defer. The Board of Pharmacy rendered its Decision and Order on December 5, 1974. Nothing now pends before any state tribunal, administrative or judicial. While it is true that plaintiffs could have chosen to challenge the Board's Order in the Appellate Division of the New Jersey Superior Court instead of here, N.J. S.A. 45:14–12, no doctrine requires them to have elected a state rather than a federal forum to pursue federal claims. Had plaintiffs chosen such a course before bringing the instant suit, of course, this Court would have had to apply the *Younger-Huffman* tests to determine whether federal court deference was appropriate.

What these plaintiffs did, however, was to pursue their defense first in the administrative forum into which they were involuntarily drawn, and upon a final adverse administrative decision, to exercise their choice of judicial forum in which to seek vindication of their federally-guaranteed rights. Where a plaintiff has exhausted its state administrative remedies, "and now would only have recourse to review of the administrative decision in the courts of [the state]," the District Court need not stay its hand. *Bowen v. Hackett,* 361 F.Supp. 854, 860 (D.R.I.1973). As the Supreme Court held in *Gibson:*

> Unlike those situations where a federal court merely abstains from decision on federal questions until the resolution of underlying or related state law issues [15]

[15] See, e. g., *Railroad Comm'n v. Pullman Co., supra; England v. Louisiana State Bd. of Medical Exam'rs,* 375 U.S. 411 [84 S.Ct. 461, 11 L.Ed.2d 440] (1964); *Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498 [92 S.Ct. 1749, 32 L.Ed.2d 257] (1972).

—a subject we shall consider shortly in the context of the present case—*Younger v. Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts. Such a course naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved. Here the predicate for a *Younger v. Harris* dismissal was lacking, for the appellees alleged, and the District Court concluded, that the State Board of Optometry was incompetent by reason of bias to adjudicate the issues pending before it. If the District Court's conclusion was correct in this regard, it was also correct that it need not defer to the Board. Nor, in these circumstances, would a different result be required simply because judicial review, *de novo* or otherwise, would be forthcoming at the conclusion of the administrative proceedings.[16] Cf. *Ward v. Village of Monroe-*

[footnote 16 omitted]

*ville,* 409 U.S. 57 [93 S.Ct. 80, 34 L.Ed.2d 267] (1972).

411 U.S. at 577, 93 S.Ct. at 1697.

Once it is ascertained that no state proceeding is pending, no doctrine of law or consideration of comity requires plaintiffs to choose a state court rather than a federal court in which to enforce federal rights. The majority reviews a growing body of law in the lower federal courts which suggests that the application of the *Younger-Huffman* rule rests on some "strong and peculiar relationship to, or interest in, the existing state proceedings" on the part of a state. *Ante,* at 1166. In finding this questionable addition to the *Younger* doctrine inapplicable to the facts of this case, though purporting to decline to decide whether the "strong state interest" approach is correct, the Court overlooks the fundamental fact which renders *Younger-Huffman* wholly inapplicable here: there is no pending state proceeding of any kind. Cf. *In re Grand Jury Impaneled January 21, 1975,* 541 F.2d 373 (3rd Cir. 1976). If we were to refuse to hear plaintiffs here, we would be sending them away to *begin* a new suit elsewhere.

In my view, the applicability of the equitable abstention doctrine does not depend upon such labels as civil, criminal, quasi-criminal or "in aid of and closely related to." Nor do I believe that the Supreme Court would decide such an issue on the

basis of some generalized analysis of the "strength" of a state's interest in the particular statute under challenge. The majority's own *caveat, ante,* at 1171, that though it does not "suggest or intimate that New Jersey is unconcerned with the proper regulation of the practice of pharmacy," the state's concern is somehow not "strong" enough to warrant our deference, makes clear the deficiency of such an approach. A state is obviously "strongly" concerned, whatever that term may mean, whenever it has enacted legislation. That a state is "concerned," in this sense, with the outcome of the litigation to which it is a party does not give it the right to compel that litigation to proceed only within its own courts.

It is my view, rather, that the basis of the *Younger* doctrine lies in the conception of "Our Federalism" enunciated by Mr. Justice Black in that seminal case. 401 U.S. at 44–45, 91 S.Ct. 746. *Younger* and its progeny are an effort to reconcile the fundamental paradox of two parallel court systems exercising overlapping jurisdiction within the same time and space. The doctrine of equitable abstention is in reality a mere accommodation, designed to smooth the functioning of the judicial branches of both the national and state governments in a federal system. It demands that a federal court stay its hand only when a state court has already assumed jurisdiction over the controversy between the parties. I view the purpose of the doctrine to be the avoidance of needless embarrassment to the state courts from federal litigation which, by virtue of the Supremacy Clause, could cause federal courts effectively to divest state courts of jurisdiction over prior lawsuits.

In the absence of a pending lawsuit, however, I cannot see why a federal plaintiff should be denied a federal forum in which to contend that his federal rights have been violated by state action. Such a conclusion implies no criticism of the state courts. On the contrary, there is no question that the

state judiciary is as fully capable as the federal to apply the federal constitution to enactments of the state legislature. *See, e. g., Stone v. Powell,* —— U.S. ——, —— n. 35, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). That alone, however, is no reason for federal courts to decline to exercise jurisdiction over federal questions once a plaintiff has elected to seek his relief here. In the absence of a pending state proceeding raising the same claim between the same litigants, we ought not to send him to the state courts merely because the state has an "interest" in the outcome of the litigation. *Zwickler v. Koota,* 389 U.S. 241, 248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). *Cf. Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972); *Cottrell v. Virginia Electric & Power Co.,* 363 F.Supp. 692, 696 (E.D.Va.1973). A state has an interest whenever its statutes are challenged as violative of federal law. That interest, no matter how strong, does not give the state the right to have the issue decided in the forum of its choice.[1]

I agree with the majority that *Pullman* abstention is also inappropriate here. *Ante,* at 1168. Since I concur in the result of Part II of Judge Garth's opinion, for the reasons just expressed, I move now to the merits.

## II

I am not as sanguine as is the majority in concluding that the statute, on its face, does not deprive plaintiffs of their due process right to a fair tribunal. For the purposes of this case, however, I find it sufficient to confine myself to plaintiffs' contention that the statutory scheme, as applied to them and to other chain pharmacies, is unconstitutional.

The majority and I diverge from the very outset. The Court states the issue as follows:

> The main thrust of Rite Aid's complaint is that it is constitutionally imper-

---

1. In the largest sense, the State's argument turns comity on its head. Why should the State be concerned whether this litigation proceeds here or elsewhere? If the courts of both sovereignties are equally competent to vindi-

cate federal rights, are they not equally competent to vindicate state interests as well? In the absence of a pending state lawsuit, what "interest" does the State have in plaintiffs' choice of forum?

missible for independent pharmacists to regulate chain store pharmacies in general and Rite Aid pharmacies in particular.

To succeed in this argument, Rite Aid must establish that the statute "as applied", results in a violation of due process, in that the members of the Board have such a substantial pecuniary interest that they cannot be impartial or disinterested in the outcome of any proceeding involving Rite Aid or any other chain store.

*Ante,* at 1171.

The Court holds that plaintiffs have failed to carry that burden. I suggest that the Court has misstated the issue, and that plaintiffs have indeed sustained their burden of proving that the statutory structure is unconstitutional "as applied."

The issue to be determined is whether the composition of the Board deprives plaintiffs of due process of law by depriving them of a fair tribunal. The majority fails to address this question directly. Instead it seeks to measure the "as applied" claim with the same yardstick it used to reject the "facial" contention: "substantial pecuniary interest." In choosing this indirect mode of reasoning to an inductive conclusion, the Court gives short shrift to the substantial, direct testimonial evidence of actual prejudice against Rite Aid on the part of the Board and the class from which the members of the Board must be drawn.

In the "as applied" context the question of pecuniary interest, as determined by market factors, is relevant only as an indirect means to measure the existence or the absence of *actual* prejudice. The majority's inquiry in this area might be significant in the absence of direct evidence of such prejudice. Even then, the appropriate market definition and requisite market share which the majority would require Rite Aid to prove are unclear. Here, however, plaintiffs have produced substantial direct evidence of prejudice against Rite Aid among the members of the Board, and more generally among the class from which such members must be selected. I would hold that plaintiffs have satisfied their burden of proof and are entitled to judgment. In my view the majority errs in relying upon Rite Aid's failure to produce a market analysis to support its contrary conclusion.

Even if we could isolate the relevant market or markets, the issue before us would not be whether a theoretically reasonable member of the class of pharmacists from which the board members are selected, given Rite Aid's percentage of the market, would be partial or impartial in passing upon matters involving plaintiffs. It may be "obvious" to the majority, as a matter of rationality and logic, "that if Rite Aid's dollar volume is but a minute fraction of the total dollar volume generated by pharmacies," *ante,* at 1171, the members of the board are *unlikely* to be prejudiced against such an unimportant competitor. The question is not, however, whether any board prejudice is rational or justified; the question is whether its exists.[2] Indeed, the question is not even what Rite Aid's market share and growth record are; the question is what the board members perceive them to be.[3] Since the relevant inquiry must therefore be necessarily subjective, I turn

---

**2.** I emphasize that the prejudice against Rite Aid which I find among the members of the board inheres in each independent pharmacist-member by virtue of his dual role as independent pharmacist and state-invested regulator. It is not some personal ill will which he may bear for reasons and from origins peculiar to him. That type of prejudice, which the majority calls "actual bias" in Part IV of its opinion, is not properly before this three-judge Court.

I note also that the recent repeal of 28 U.S.C. §§ 2281 and 2282 by Pub.L.No. 94–381, effective August 12, 1976, is of course inapplicable to actions commenced before the date of enactment. Pub.L.No. 94–381, § 7 (Aug. 12, 1976).

**3.** Even under the majority's approach, there is ample evidence in the record to suggest that Rite Aid was and is a significant force in the industry. For example, the parties have stipulated that Rite Aid's New Jersey pharmacies filled approximately 1,278,000 prescriptions in 1973, producing gross sales of about $4,000,-000. In 1974, according to the stipulated facts, Rite Aid's New Jersey pharmacies filled approximately 1,600,000 prescriptions for gross sales of about $7,000,000, and in 1975, 1,800,-

to the direct evidence bearing on the state of mind of the class from which the members of the Board of Pharmacy are required to be drawn.

There can be no dispute that Rite Aid's growth in New Jersey has been meteoric. Rite Aid opened its first pharmacy in this state in 1966.

> Since then, the number of Rite Aid pharmacies in New Jersey has increased to approximately thirty-seven. Five additional pharmacies are scheduled to open within the near future. With respect to the increased sales in New Jersey, Rite-Aid pharmacies filled in 1973 approximately 1,278,000 prescriptions which produced gross sales in the approximate amount of $4,000,000. In 1974 it is projected that Rite-Aid pharmacies in New Jersey filled approximately 2,000,-000 prescriptions and had gross sales in excess of $7,000,000.

Supp.Aff. of Strauss, ¶ 3.

By the time of trial these statistics were even more striking. From two pharmacies opened in 1966, Rite Aid's presence in New Jersey had grown to 49 pharmacies by the first week of 1976. (Tr. 1/29/76: 13) From $4,000,000 in New Jersey prescription sales in 1973, Rite Aid jumped to nearly $9,500,000 by the end of 1975. (Tr. 1/29/76: 18) Rite Aid's vice president, Timothy Noonan, testified without contradiction that this growth in dollar value of prescription sales was "faster than the national rate of growth in prescription business," and suggested that this statistic demonstrated that at least part of Rite Aid's growth was at the expense of existing pharmacies. (Tr. 1/29/76: 19; *cf.* Exhibit P–1)

Noonan also testified that Rite Aid advertises on radio and television and in newspapers throughout the State of New Jersey, using seven radio stations, ten television stations and forty-three newspapers. (Exhibit P–2) It was his testimony that the thrust of Rite Aid's advertising was an effort "to present a discount image . . . particularly in . . . health and beauty aid and general sundry merchandise," otherwise known as "front-end" merchandise. (Tr. 1/29/76: 7–8; Exhibit P–4) Noonan also noted that Rite Aid offers a 10% senior citizen discount on prescription items to patrons over 60 years of age, but that New Jersey law forbade the advertising of prescription prices. (Tr. 1/29/76: 9–10) Though Rite Aid could not advertise the fact, its prescription prices were 15–20% below those of the average independent pharmacy. (Tr. 1/29/76: 11)[4] Noonan testified that Rite Aid had spent over $1,000,000 on advertising in 1975, and had budgeted $1,300,000 for advertising in 1976. (Tr. 1/29/76: 11–12)

It is apparent from the record that the "front-end" prices which Rite Aid did advertise appeared in newspapers read even in communities in which Rite Aid presently maintains no pharmacy, by patrons of pharmacies which do not presently compete directly against any Rite Aid outlet. Moreover, as the deposition testimony demonstrates, Rite Aid's growth from two to forty-nine pharmacies is an event which did not go unnoticed by small independent

---

000 prescriptions for gross sales of about $9,466,000.

By contrast, the pharmacies owned by the five members of the board, taken together, filled 463,615 prescriptions in 1973 and 411,160 in 1974. Except for defendant Silnutzer, who showed an increase of less than 6%, the prescription volume of each board member declined in 1974. (Stipulation of Facts, Tab A, at 7–8)

What percentage share of what relevant market would be sufficient for the majority to find a "substantial" pecuniary interest on the part of the class of all New Jersey pharmacy owners? Suppose Rite Aid did 10% of the prescription volume in County A, 5% in County B and 40% in County C. What would that mean to an independent in each of these counties?

4. That law has since been implicitly invalidated by the United States Supreme Court in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Presumably Rite Aid may now advertise its cut-rate prescription prices directly. This development can hardly be expected to endear Rite Aid to its small, independent "regulators." Whether their individual stores are located near to or far from a Rite Aid store, their customers will now be able to compare Rite Aid's prices to what is charged locally.

pharmacists throughout the State, regardless of whether those pharmacists were in direct competition with a nearby Rite Aid pharmacy at any particular time.

In this regard a significant portion of Noonan's testimony, as it relates to the board members' perception of Rite Aid, concerns Rite Aid's full-time realty department. It was Noonan's testimony that Rite Aid employs full-time realtors who "are constantly looking for new locations." (Tr. 1/29/76: 23) In addition, Rite Aid uses brokers to alert its real estate staff to likely new locations for pharmacies. Through the use of these procedures, Rite Aid has grown so swiftly that by the morning of trial, there were two more Rite Aid pharmacies than there had been two weeks earlier when P–1 was prepared, for a total of fifty-one with four more applications in various stages of processing. (Tr. 1/29/76: 24)

Rite Aid's substantial presence in New Jersey, however, is not even a major portion of the total wherewithal of this formidable organization. Rite Aid operates more than 360 pharmacies nationally and grosses nearly half a billion dollars annually. As the record amply demonstrates, whatever Rite Aid's present percentage of the entire New Jersey market may be, or any sub-market, it is infinitely greater than that of any one independent pharmacist. It is also clear from the record that Rite Aid has the capacity to become a direct competitor of any New Jersey pharmacy whenever it chooses, simply by opening yet another new pharmacy.

The depositions of members of the board reveal their acute awareness of these facts of business life in the New Jersey pharmacy industry. Defendant Sussman admitted in his deposition that he knew that Rite Aid's prices for prescription and other products were lower than those of individually-owned pharmacies (Tr. 1/29/76: 28), and that he recognized the possibility that Rite Aid's price policy could tend to dilute the business of individually-owned pharmacies. (Tr. 1/29/76: 29)

Defendant Campbell's deposition reveals that he knew that Rite Aid pharmacies "are so-called discount operations." (Tr. 1/29/76: 80) He testified that the term "discount" meant to him that "they sell for less than the suggested retail, but this is not uncommon." *Id.* He added: "I suspect that [my prices] [a]re higher [than Rite Aid's]." *Id.*

The following colloquy between defendant Campbell and counsel for plaintiff at the Campbell deposition illustrates the defect I perceive in the statutory scheme as applied to Rite Aid and other chains:

Q: . . . But in the event that a Rite Aid Pharmacy were to seek permission to open a pharmacy in your geographical area you would consider that, would you not, to be a factor which would have an affect upon your business judgment?

[Objection and discussion by counsel omitted]

A: Succinctly, yes, if I thought Rite Aid or heard Rite Aid was going to open a pharmacy next door or across the street I'd be concerned, of course, as anyone else would.

Q: Why would you be concerned about Rite Aid?

A: As I would with anyone else. I feel you can slice a pie just so many times.

Q: What do you mean slice a pie so many times?

A: There's a given market in an area and, as I say, you can cut it just so many times. And if when *any* new operation, *any* new practitioner, came into the area he would have to succeed, if he succeeded, at the expense of those already there.

Q: Okay. Now, would you be concerned or fear a new Rite Aid Pharmacy more than an independently-owned pharmacy?

A: Yes, I would.

Q: Why?

A: Well, it's a large corporate structure so they can afford, so to speak, to hang in there—hang in there for a longer period of time.

Q: What do you mean hang in there?

A: Well, when you open a new pharmacy it's seldom profitable the first few months. And you have to have—it requires capital to "hang in there."

(Dep. of Campbell, at 81–82)

Rite Aid's failure to prove by market data that it presently dominates the *entire* pharmacy industry in every local community throughout the State is immaterial to the proven perception of Rite Aid as an impending, if not immediate, threat to *any* small pharmacist.

Defendant Campbell further testified that the Board members are aware of a general feeling of antipathy toward chain pharmacies among the members of the New Jersey pharmacy profession (Tr. 1/29/76: 86–99), and that some concern had been expressed to him with regard to Rite Aid's rapid growth:

Q: Have any owners of individual pharmacies such as your own discussed with you the growth of Rite Aid Pharmacies in New Jersey?

A: I can't recall specifically.

Q: Well, has the subject ever come up at any time that you can recall?

A: I have heard it.

Q: What have you heard?

A: That they're expanding probably at association meetings.

. . . . .

Q: How about generally, Mr. Campbell, have you ever discussed or has anybody ever discussed Rite Aid Pharmacies with you?

A: I'm sure they have.

Q: Tell me generally what was said.

A: It's been months or years ago and I can't really remember, they were expanding and buying stores in New Jersey, they were opening new stores.

Q: Was it a concern of these individuals that Rite Aid was opening new stores in New Jersey, a concern that it might affect their business?

A: I honestly can't recall. It was more "Wow, they're really moving" or something like that. I can't recall specific times or if there were numerous times or maybe once or twice.

(Dep. of Campbell, at 82–83)

The constitutional infirmity of the present regulatory system is highlighted by the following testimony by defendant Campbell.

Q: And how do you become aware of this feeling of antipathy?

A: *Well, we're—we're members of the Board of Pharmacy but we—that occupies only a small part of our time. We're all engaged in operating our own pharmacies and we see and talk to other pharmacies, other pharmacy owners.*

(Dep. of Campbell, at 88–89) (emphasis added)

Q: . . . This antichain feeling and sentiment that has been expressed for the past twenty-five years, the basis of that feeling is essentially that the chain prevents the individual from making as much money as he wants to make. Isn't that right?

A: Yes, insofar as it goes.

Q: It boils down to how much money you're going to make, doesn't it, Mr. Campbell?

A: (The witness nods his head in the affirmative).

Q: You have to answer "yes."

A: Yes. Excuse me.

Q: And just as you're aware of this economic interest, so too are the other members of the Board?

A: *Yes, any practicing pharmacist is aware of it.*

Q: Aware of that?

A: His economic interest. It's not just competition. There are a lot of economic interests. . . .

(Dep. of Campbell, at 93) (emphasis added)

The State conceded the credibility of the Campbell deposition, and stated that it dis-

puted none of his deposition testimony. (Tr. 1/29/76: 147)

Defendant Silnutzer testified at his deposition in a similar vein, though more guardedly:

Q. Did you ever discuss with any of your fellow board members the growth of the Rite Aid Pharmacies within the State of New Jersey?

A. Not that I recall.

Q. Did you ever discuss it with any pharmacy—any pharmacies?

A. I guess I might have.

Q. Do you recall what you would have discussed?

A. No. Generally the fact that Rite Aid was growing. I recall having talked about their stock market situation. I guess the same thing that a layman would talk about, about the growth of Rite Aid.

Q. Was the growth of Rite Aid of any particular concern to you?

A. No.

Q. Did the subject of Rite Aid's growth or method of doing business ever come up during the course of any board meetings?

A. Not that I can remember.

Q. Did the subject of chain store pharmacists ever come up during the course of any board meetings or outside board meetings, for that matter?

MR. LA BUE: Can we define chain store in terms of number?

Q. Do you know—do you understand what I mean by a chain store, Mr. Silnutzer?

A. Yes.

Q. Did that subject ever come up at any board meeting?

A. Not that I can recollect.

Q. How about outside the board meetings?

A. Yeah. I think—well, you can pick up any trade journal and read about chain stores as differentiated from independents.

Q. That would have been discussed amongst the board members, wouldn't it?

A. Well, except between meetings I rarely spoke to or saw other board members. I can tell you I saw other pharmacists and that it was a topic of discussion.

Q. What would you have discussed with other pharmacists?

A. What would I have discussed?

Q. Yes, about chain stores.

A. I guess growth. Maybe the way they're differentiated from the average independent, and the way they do business. I think that rather covers it.

Q. *The chain stores growth and method of doing business would be of concern to the independent pharmacy owner, would it not?*

A. It is to some, not to me particularly.

Q. Why would it be of interest to some?

A. *Well, many independents feel that chain stores are highly competitive and may put them out of business in their own particular areas.*

Q. *And that sentiment has been expressed to you by some independent owners of pharmacies, has it not.*

A. *By many.*

Q. A lot?

A. The Trade Press, they usually compare—

Q. You said the press would pretty much express the fear, I think you said. And you were going to say something else and you were interrupted by the Reporter.

A. Yeah. I think the Trade Press—I'll differentiate—I think has expressed the fear that pharmacists have expressed, that the chain stores will take over the drug business and they'll be—I think small pharmacists particularly have the fear that chain stores are going to put them out of business.

Q. This fear, putting the independent out of business, that's been expressed

to you, would you say on many occasions?

A. No. I don't think this topic is a topic that occurs among professionals any more than any other topics.

Q. But the number of persons who have expressed this fear to you, would you say there have been many persons, a few persons, somewhere in between?

A. I can't tell you that anybody has personally to me said "I'm going to go out of business," you know, but I think they reflect the view of a lot of people put together, that they're competing with these people.

Q. It's a fear on their part?

A. Yeah. Except, you know, I don't know how many—like myself, I'm aware there's this fear on the part of pharmacists, independent pharmacists. I don't have that fear myself.

Q. But the others do?

A. Yeah.

Q. Whether rightfully or wrongfully, they have this fear?

A. Well, maybe they do. You know, from what I know—from what I hear and what I read in the press, they do.

Q. Has this fear of competition between the independents and the chain store pharmacy been expressed at any pharmacy association meetings?

A. Not that I can recall in particular.

Q. Have any of your fellow board members expressed this fear of competition?

A. No.

Q. You don't recall?

A. (The witness shakes his head in the negative.)

Q. You have to answer "no."

A. Oh, no. . . .

Q. Okay. You say that the Trade Press has echoed the fear of chain store pharmacies—the fear of independents toward the chain store pharmacies. Is that correct?

A. I think that's pretty correct.

Q. Are you referring to any specific trade publication which expresses that fear?

A. No.

Q. Is there any particular magazine that you're referring to or—

A. No. I think any date of any issue you can find it in any of the trade journals.

Q. And I take it that at the time you were a board member that you were aware of this fear of competition on the part of independents toward the chain stores?

A. And before and since.

(Dep. of Silnutzer, at 31–36) (emphasis added)

Silnutzer isolated yet another defect from which the Board suffers, not only because it has a competitive interest in the business of those it regulates, but also because it knows it has. Because he was aware of the competitive antagonism between independents like himself and chain stores like Rite Aid, Silnutzer testified, he deliberately "bent over backwards" to schedule fewer enforcement inspections of Rite Aid than of independents, and to impose lesser penalties on Rite Aid than on independents:

Q. Why did you think that by increasing the penalty you might be accused of signaling Rite Aid out if you had not been previously accused of that?

A. Well, I guess there were some thoughts I had. You know, almost subliminal, but they were there. Part of it was what we talked about, the fact that pharmacists, independent pharmacists, are believed to be in fear of chains—

Q. That was in your mind?

A. That's always in my mind. In the early years, when I first came to the board, board inspections were carried out by members with relation to the granting of permits or transfer of permits, or anything else.
I guess I didn't do it with independents and say I've been to this kind of guy, so I wouldn't go into that store or I've seen this kind of opera-

tion so I wouldn't go into that one. But I took special care that I didn't— *I guess I didn't inspect as many Rite Aids proportionately or chains generally as independents, because, you know, I had—I had the feeling even at that time that we might be accused of picking on these people.*

My feeling is that in the minds of the chain—I'm not connected with chains, I'm concerned more with the independent, and they read the press too, they probably feel if the independent fears them that I fear them. I don't. But *I had the feeling that they might point a finger at me and accuse me of feeling that way and behaving that way because of this feeling. So I took pains not to do too many inspections of chain stores generally.*

(Dep. of Silnutzer, 12/1/75, 40–41)

And on cross-examination by the Deputy Attorney General:

Q. The 90-day period of suspension then in your opinion, was that a lesser or a greater penalty than had been imposed on independents for similar violations?

MR. RICCIO: Objection.

MR. DIZZIA: Your objection is noted.

Q. Can you answer that question, Mr. Silnutzer?

A. *Yes. I thought it was rather lenient as compared to other penalties that we had imposed.*

Q. Is there a reason why it was more lenient than those other penalties?

A. I think I expressed it. I guess you want me to express it again.

Q. If you would.

A. Yeah. I guess, and again I can speak only for myself, not for the rest of the board, but in my mind I didn't want to be accused of going out of my way to pick on Rite Aid or to impose any harsh kind of penalties. And I wanted to be very certain not to make the penalties any stricter than the penalties we had imposed

against anybody else. *I think maybe in bending over to do that I would rather have it the other way. I would rather be more lenient with Rite Aid.*

Q. *You bent over backwards to be lenient to Rite Aid?*

MR. RICCIO: Objection.

A. Um-hum.

(Dep. of Silnutzer, 12/1/75, 51–52) (emphasis added)

I view that sort of regulation as a disservice to the public, the pharmacy industry and the individual litigant before the board. To me it matters not if the awareness of a competitive interest influences the judge for rather than against the litigant before him. In either event the adjudicative process is poisoned.

Regardless of defendant Silnutzer's professed approach to the regulation of Rite Aid, however, there is one crucial fact in the record which in my view demonstrates the error of the majority's decision: the Board's "freeze" of all Rite Aid applications because of the pendency of disciplinary litigation against one Rite Aid store, Rite Aid of Bergenfield.

Rite Aid Corporation is a public corporation, listed on the New York Stock Exchange, with approximately 6,000 shareholders. It operates 360 pharmacies and an additional 100 non-pharmacy stores in 12 states. Its most recent total gross sales were approximately $400,000,000, generating an annual pre-tax profit of $20,000,000. (Tr. 1/29/76: 58–60)

Franklin Brown, Vice President and General Counsel for Rite Aid Corporation, testified that the Board refused to consider further Rite Aid applications for pharmacy permits, or to act on pending applications, for a period ranging from December 1973 to July 1974. Plaintiffs introduced into evidence a letter dated January 31, 1974 (P–4) from defendant Paul Pumpian, Secretary of the Board, to Louis E. Lehrman, President of Rite Aid Corporation. The letter substantiates plaintiffs' allegation that the Board imposed a "freeze" on Rite Aid applications:

Dear Mr. Lehrman:

Reference is made to the application filed by Rite Aid Pharmacy of Wildwood, Inc. for a permit to conduct a pharmacy at 3306 Pacific Avenue, Wildwood, and to advise that the Board has not approved the application.

The Board plans to hold a hearing on this application under Section 45:14–33 [illegible] of the Pharmacy Act which states, in part "Upon application made on a form prescribed and furnished to the Board, and upon payment of the required fee, the board shall issue a permit to conduct a pharmacy to such persons as it shall deem qualified to conduct such business."

Because of the reports of numerous violations by Rite Aid now before the Board, the Board has deemed it necessary to hold a hearing on the Wildwood application to determine if your corporation can still be considered as "qualified to conduct" a pharmacy.

*The hearing on this application, however, will not be scheduled until action on the reported violations has been taken.*

. . . . .

(emphasis added)

In response to this letter, according to Brown's testimony, Brown telephoned Pumpian in early Febraury, 1974. He had previously called Pumpian in mid-January "to follow up" on the Wildwood application. Brown testified that Rite Aid was "anxious to get this particular permit because at that time a pharmacy in our neighborhood was closing and we wanted to transfer as much of that business to our store as we could. So I was moving the permit along as best I could." (Tr. 1/29/76: 54) Brown continued:

When I telephoned Mr. Pumpian in mid-January, he advised me that we were not going to get this license following the inspection. He placed no emphasis at all on the idea that we might have failed in the inspection and he did not indicate that.

He said, rather, that we would not receive any license at Wildwood or elsewhere until we had gotten a final resolution of an alleged series of violations in our Bergenfield store. Mr. Pumpian told me that he was sending a letter to that effect to Mr. Lehrman, that upon receipt of that letter I could be in touch with him.

Then when the letter arrived a few days later, I telephoned Mr. Pumpian and forcefully objected to what I termed to him an unlawful refusal on the part of the Board of Pharmacy to process our application in Wildwood. And Mr. Pumpian told me not only would it be Wildwood, but we would not receive any licenses for any new pharmacies in New Jersey until the dispute in Bergenfield was cleared up.

Q Now, following those two telephone conversations with Mr. Pumpian and the letter that Mr. Lehrman received, what did you do?

A I did two things. I urged Mr. Pumpian to have the Board reconsider this action on their part, this refusal of any licensing, and I contacted my counsel in Newark, Donald Robinson, and Mr. Robinson and I pursued contacts with the Deputy Attorney General, Mr. LaBue, who was attached to the Pharmacy Board or who does some of their work, and we appealed also to Mr. DelTufo, the First Assistant Attorney General.

Q Stopping there, you are familiar with the stipulation concerning your conversations and your meeting with Mr. DelTufo, are you not?

A I am.

Q Now, following your meeting with Mr. DelTufo and his reference to you, as stipulated, to Mr. LaBue, Deputy Attorney General in Newark, what, if anything, did you do concerning new store applications and when did you do it?

A Well, we continued conversations with Mr. LaBue repeatedly for a few months, attempting to persuade him to advise the Pharmacy Board to allow us to have applications processed. Finally, it seems to me that it was some time in late May, 1974, Mr. LaBue indicated offhandedly that maybe it was time for us to file

an application and pursue such an application and that the first one should really be a re-application or a request for a hearing on the Wildwood application which had been filed five or six months earlier.

Q Did you do that?

A Yes, we did.

Q And did you then process additional applications?

A Yes. We processed several other applications at about the same time, because we had six or seven pending that we had wanted to open and had been delayed during that period of five or six months.

We were granted a hearing on the Wildwood matter and it was a brief hearing and the Board immediately following the hearing granted us a license in the Wildwood application, but that was in late June—to be specific, early July, 1974.

. . . . .

Q Was there a period of time during which Rite Aid did not receive any new store permits for New Jersey pharmacies?

A Yes. That period ran from December, '73 to July, '74.

Q And was there also a period of time when Rite Aid Corporation did not apply for any new store applications with one exception?

A Yes.

Q And what was that period of time?

A We did not make any application from February, the beginning of February, '74, to say May, '74.

Q Why?

A Because Mr. Pumpian told me that this would be a futile act.

Q Was that the period of time during which you had your meetings with Mr. DelTufo and Mr. LaBue?

A Yes.

Q On the Deputy Attorney General level?

A Yes. That is the period.

Q Now, did you apply for one new store application during that period?

A Yes.

Q Which one and why?

A Passaic. We applied for one—we applied for a license in Passaic in May, 1974, because it was a condition of our lease that we apply for a license for a pharmacy because our landlord was a supermarket and our landlord demanded that we be a pharmacy and not just a health and beauty aid store, and the lease said that we could open as soon as we applied for the license.

So, though I knew that it might be a futile act to apply at that time, I applied to comply with the literal requirements of the lease in Passaic.

Tr. 1/29/76: 54–58.

Defendant Pumpian testified on defendant's case. He stated that the Bergenfield investigation began when he received a letter of complaint against Rite Aid from a pharmacist in the Bergenfield area, alleging that a local physician had posted a notice in his office advising his patients not to use the Rite Aid Pharmacy in Bergenfield. Pumpian sent the pharmacists's complaint to the Enforcement Bureau with a request to investigate. (Tr. 1/29/76: 195–196) The local pharmacist's complaint was dated April 6, 1973, and Pumpian's memorandum requesting an investigation was dated April 13, 1973. (Tr. 1/29/76: 201; Stipulation of Facts, Tab A–1) Reports of that investigation were forwarded to the Board on August 22, 1973. The Board set the matter for a formal hearing. (Tr. 1/29/76: 202)

Pumpian testified that at a Board meeting on January 23, 1974, the Board "agreed that no action should be taken on the Wildwood application until a decision on the violations of the Pharmacy Act by Rite Aid, referring to the Bergenfield situation, were [sic] resolved." (Tr. 1/29/76: 203) After a five-month delay, however, the Board granted a hearing on the Wildwood application despite the fact that the Bergenfield complaints had still not been resolved. The Wildwood hearing was held on June 24, 1974, and the Wildwood application was approved by the Board that same day. (Tr. 1/29/76: 207–208) This reversal of position was, according to Pumpian, the result of a

legal opinion from a Deputy Attorney General. Pumpian testified:

> We were advised that the Bergenfield store—the applicant for the Bergenfield store is Rite Aid of Bergenfield. The applicant for the Wildwood store is, I think, Rite Aid of Wildwood. That there is a different—a separate corporate entity and, therefore, the only matter that could be considered on the Wildwood application were [sic] matters relating to the Wildwood store, the Wildwood corporation.
>
> Because of this no other pending Rite Aid matters were considered on the Wildwood application because of the separate corporate veil, if you wish.

Tr. 1/29/76: 212–213.

Pumpian testified that "the numerous violations by Rite Aid" cited in P–4 were in fact "fifteen or twenty" complaints received against Rite Aid by January, 1974. About half these complaints had been made by pharmacists. (Tr. 1/29/76: 209–210) It was Pumpian's testimony that he received such complaints against Rite Aid from pharmacists whenever Rite Aid opened a new pharmacy near them. (Tr. 1/29/76: 258–259)

The prejudice of the board against Rite Aid is manifest in this testimony. Based on fifteen or twenty complaints over a period of more than seven years of operations in New Jersey, most if not all from competitors, when Rite Aid was operating at least 27 pharmacies in New Jersey and hundreds out-of-state, the board froze all action on pending applications and barred future applications for new facilities from this New York Stock Exchange corporation indefinitely, on the purported basis that Rite Aid's qualifications to conduct any pharmacy anywhere were in doubt. The specific impetus for this action, we are told, was a complaint by yet another local competitor, this time of Rite Aid's Bergenfield pharmacy.

Only after months of freezing any further Rite Aid expansion did the board relent and rescind the ban, on the technical basis that it had been wrong to consider against Rite Aid of Wildwood complaints filed against Rite Aid of Bergenfield, in view of their separate corporate identities. Thus the board attempted to insulate itself from allegations of prejudice while effectively barring further Rite Aid expansion in this state for five months.

The record before us demonstrates the strategy used by the members of the board. Rite Aid's inevitable growth in New Jersey was to be delayed. The freeze on old and new applications and the increase in penalties beyond the recommendation of the hearing officer were part of that effort. The facts of Rite Aid's growth and structure, well-known to the board members, made clear to them that if today's application to conduct a pharmacy were not for a site across the street from a member's own pharmacy, tomorrow's might well be.

The testimony of the members of the board at depositions, when combined with the evidence of the board's actual conduct against Rite Aid, amply supports plaintiffs' allegations of "as applied" unconstitutionality. It is evident from the facts adduced that the members of the board were well-aware of Rite Aid's extraordinary growth record, both within and without the state. The Board knew that Rite Aid's successful operations in many states supplied a ready "deep pocket" to subsidize cut-rate prescription pricing in New Jersey. I have no doubt, based on this record, that the members of the Board were aware of Rite Aid's low-price policy, of its full-time realty staff seeking continued expansion and of the growing role of this and other chains in the New Jersey pharmacy market. (Stipulation of Facts, Tab A, at 7–8) Under these circumstances, the Court's observation in *Wall* is well-stated:

> If the board's argument regarding geographical location were accepted, the board could challenge the licenses of all the optometrists in the state simply by disqualifying the member from Atlanta in all Atlanta cases; disqualifying the member from Tifton in all Tifton cases, etc. In this way, the board could—and does—argue that it has removed the fi-

nancial interest in the case geographically, while assuring through this "round-robin" procedure that essentially the same board decided all the cases. *In other words, the possibility for "log-rolling" or mutual "backscratching" is enormous.* 379 F.Supp. at 189 (emphasis added).

Thus, the majority's suggestion that if a given member of the board were a direct competitor of Rite Aid, "[t]he proper procedure . . . would be to seek the disqualification of the interested Board members," *ante* at 1174, n. 25, is, as the Court held in *Wall*, "simply . . . not good enough." (379 F.Supp. at 189) Its deficiency lies not only in the possibility that a pharmacist-board member from Cape May may strike back at a Rite Aid outlet in Cape May by penalizing a Rite Aid outlet in Bergenfield. The most pernicious aspect of the statutory scheme rather, is that a pharmacist-board member in Sussex, where there may be no Rite Aid competitor, may find it prudent to win the Battle for Sussex, on a street-corner in Bergenfield; indeed, if Rite Aid can be stopped or delayed in Bergenfield, the Battle for Sussex may never need to be fought at all.

The majority fears a parade of horrors from the result I would reach here. *Ante,* at 1170, n. 19. It was suggested by my brothers at oral argument that the views I set forth here would spell the end of "self-regulation" of the professions, *e. g.,* Tr. 1/29/76: 92–93, or would prevent the State from regulating the professions through technically competent officials, *ante,* at 1170, n. 19.

In my view these fears are groundless. What is before us now is not a system of professional "self-regulation." This is state regulation. We deal here not with some informal professional board which renders advisory opinions and relies merely on the force of moral suasion to enforce them. On the contrary, this board is constituted by statute and vested with the formidable police power of the State. Though its members are practicing pharmacists, they are public officials. The vice of the present system is that these public officials are required, by the very statute which grants them the power to regulate, to continue their active role in the class to be regulated. The power exercised by this board is the power of the State, and it is the power of the State that is circumscribed by the Due Process Clause of the Fourteenth Amendment.

As for the feared threat to regulation by persons skilled in the field, the permissible alternatives to a system which requires the board members to continue the active conduct of a pharmacy during their tenure are many. The State may employ qualified pharmacists to sit as members of the Board of Pharmacy full-time, provided that they not practice during their term of office. It could choose to compensate them for their services as it compensates Mr. Pumpian, a full-time state employee. The legislature might prefer instead to recruit volunteers from the faculties of pharmacy schools or the ranks of the recently-retired. There may well be other regulatory structures which would guarantee effective professional regulation within the restrictions imposed by the Constitution. In these ways the State could achieve its rational and laudable goal of competent professional regulation without depriving the regulated of their constitutional rights.

### III

On this record, I would hold that the statutory scheme requiring the board to be composed principally of active practicing pharmacists, as applied to these plaintiffs, deprives them of their due process right of a fair tribunal.

For the foregoing reasons, I respectfully dissent.[5]

---

**5.** I note that the Court leaves open the possibility of further proceedings before a single judge of this Court. *Ante,* at 1177–1178, 1179. Since I am the district judge to whom the case was initially assigned, any further proceedings would normally come before me. In light of the views I have expressed in this opinion, however, I hereby request the Clerk to cause any remaining proceedings in this matter to be assigned to another judge of this Court.